# United States Court of Appeals
# for the Federal Circuit

---

**POWERTECH TECHNOLOGY INC.,**
*Plaintiff-Appellant,*

v.

**TESSERA, INC.,**
*Defendant-Appellee.*

---

2010-1489

---

Appeal from the United States District Court for the Northern District of California in case no. 10-CV-0945, Judge Claudia Wilken.

---

Decided: September 30, 2011

---

MATTHEW B. LOWRIE, Foley & Lardner, LLP, of Boston, Massachusetts, argued for plaintiff-appellant. With him on the brief were KENNETH K. KROSIN and GEORGE C. BECK, of Washington, DC; GEORGE C. BEST and GINA A. BIBBY, of Palo Alto, California; and MICHAEL R. HOUSTON, of Chicago, Illinois.

JOSEPH M. LIPNER, Irell & Manella, LLP, of Los Angeles, California, argued for the defendant-appellee. With him on the brief were MORGAN CHU, JONATHAN H.

STEINBERG, KENNETH J. WEATHERWAX, and NATHAN
LOWENSTEIN.

---

Before DYK, MOORE, and O'MALLEY, *Circuit Judges*.

DYK, *Circuit Judge*.

Powertech Technology Inc. ("PTI") filed a declaratory
action seeking declarations of non-infringement and
invalidity of Tessera, Inc.'s ("Tessera") United States
Patent No. 5,663,106 ("'106 patent"). The United States
District Court for the Northern District of California
dismissed the action for lack of subject matter jurisdic-
tion, finding no Article III case or controversy between the
parties. *Powertech Tech. Inc. v. Tessera, Inc.*, No. 10-
00945, 2010 WL 2194829 (N.D. Cal. June 1, 2010). Be-
cause we conclude a controversy did exist, we reverse and
remand for further proceedings on the merits.

## BACKGROUND

### I

A semiconductor chip ("chip") is a miniaturized elec-
tronic circuit that can be incorporated into larger elec-
tronic devices like cell phones and personal computers. A
semiconductor package ("package") protects a delicate
chip from mechanical and thermal damage by encapsulat-
ing it in molded plastic, generally referred to as an "en-
capsulant." The encapsulation process, however, can
sometimes contaminate the delicate terminals on the
exterior of the chip, preventing the terminals from con-
necting the package to other electronic components.

Tessera's '106 patent is a process patent that is di-
rected to methods for preventing the contamination of
exposed chip terminals during encapsulation. As illus-
trated below, the claimed process requires a protective

barrier (30) which protects terminals (26) of the chip (12) from coming in contact with the encapsulant (40) when it is injected into the encapsulation area through a fill hole (36).



FIG. 1

PTI is a Taiwanese sub-contracting company that packages chips for various customers in the semiconductor industry. PTI's customers send bare chips to PTI, and PTI encapsulates them in protective materials before returning the packaged chips to the customers. Notably, as the packager of the chips, PTI appears to be the only party in the supply chain to allegedly practice the method claims of the '106 patent (i.e., the encapsulation of the chip in protective materials). PTI's customers then incorporate the pre-packaged chips into downstream electronic products for marketing, selling, and importing worldwide, including in the United States. As discussed below, Tessera has alleged that PTI's encapsulation process is covered by the claims of the '106 patent.

Since the late 1990s, Tessera has licensed its technology to more than sixty semiconductor companies through agreements called Tessera Compliant Chip Licenses ("TCC Licenses"). Tessera and PTI entered into such an

agreement on October 20, 2003, under which PTI agreed to pay running royalties in return for a license under the '106 patent (and other patents) to assemble, use, or sell certain "TCC Licensed Products." PTI claims it has complied with all of its obligations under the license agreement, including the obligation to pay royalties on a post-sale quarterly basis.

## II

The current declaratory action stems partly from Tessera's allegations in two earlier suits—one before the United States International Trade Commission ("ITC proceedings or action") and one in the United States District Court for the Eastern District of Texas ("Texas action"). In the ITC action, Tessera sought relief under Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, alleging infringement of the '106 patent and three other patents by eighteen defendants through the importation and sale of certain semiconductor chips. *See In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III)*, No. 337-TA-630 (Int'l Trade Comm'n Feb. 24, 2010) ("*Final Determination*"); *In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III)*, No. 337-TA-630 (Int'l Trade Comm'n Aug. 28, 2009) ("*Initial Determination*"). In the Texas action, filed on the same day as the ITC action, Tessera asserted infringement of the same patents, accusing the same defendants and products. Tessera's Complaint for Patent Infringement and Jury Demand, *Tessera, Inc. v. A-DATA Tech. Co.*, No. 2:07-CV-534 (E.D. Tex. Dec. 7, 2007), ECF No. 1. As Tessera has conceded, the Texas action "is no different than the [ITC action] for present purposes." J.A. 432. The Texas action has been stayed pending the final outcome of the ITC proceedings. *See* 28 U.S.C. § 1659.

The accused products in the ITC and Texas actions were semiconductor chips that come in two formats: a first group consisting of so-called "wBGA" chips and a second group consisting of so-called "µBGA" chips.[1] PTI is licensed by Tessera to manufacture both wBGA and µBGA chips. Though PTI was not a named party in either the ITC or Texas action, it maintains that some of the accused companies were customers who directly or indirectly purchased their wBGA and µBGA chips from PTI. For example, PTI asserts that three of the accused companies—Elpida Memory, Inc. ("Elpida"), Powerchip Semiconductor Corp., and ProMOS Technologies Inc.—used (and continue to use) PTI to package their chips, and that most of the other accused companies indirectly purchased PTI-packaged chips from these three companies or similar companies. In addition, PTI asserts that Kingston Technology Co. directly purchased packaged chips from PTI to incorporate into downstream electronic products.

In the *Initial Determination* of the ITC proceedings, the Administrative Law Judge ("ALJ") ruled that the '106 patent was not invalid and not infringed by the accused wBGA and µBGA products. The ALJ also determined that Tessera's patent rights were exhausted with respect to all accused products sold by Tessera's licensees, including PTI.[2] In its *Final Determination*, the ITC affirmed

---

[1]    Our recent decision in *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1361–62 (Fed. Cir. 2011), provides a helpful summary of the technology underlying these chips.

[2]    In *Quanta Computer, Inc. v. LG Electronics., Inc.*, 553 U.S. 617, 625 (2008), the Supreme Court explained that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *See also*

the ALJ's determination that the wBGA products did not infringe, but it held that the µBGA products did infringe. The ITC did not, however, issue an exclusion order under Section 337 with respect to the µBGA products because it determined that Elpida was the only importer of µBGA chips and that all of Elpida's µBGA chips were purchased from licensed vendors, including PTI.

The ITC action culminated in our recent decision in *Tessera, Inc. v. International Trade Commission*, 646 F.3d 1357, 1361 (Fed. Cir. 2011), where we affirmed the ITC's finding that there was no Section 337 violation. We held, inter alia, that (1) the '106 patent was not invalid as anticipated by three prior art references: U.S. Patent Nos. 5,136,336 ("Worp"); 5,218,759 ("Juskey"); and 4,868,349 ("Chia"); (2) the accused wBGA products did not infringe the '106 patent; and (3) though Elpida did not dispute that the µBGA chips infringed the '106 patent, we held that Elpida was nonetheless protected by a valid patent exhaustion defense, having purchased all of its products from licensed subcontractors, including PTI. *Id.* at 1366–67. We ultimately remanded the case back to the ITC, but the matters on remand are not pertinent to our current analysis. *Id.* at 1371.

### III

While the ITC action was underway, PTI made royalty payments to Tessera for the wBGA products sold during the fourth quarter of 2009. These payments, however, were made "under protest" because PTI believed that the wBGA products did not infringe the '106 patent

---

35 U.S.C. § 273(b)(2). In the ITC action, Elpida asserted that it was authorized to sell the accused chips because it had obtained 100% of its products from seven licensed subcontractors, including PTI, all of which were authorized to sell the accused wBGA and µBGA chips.

and that the '106 patent was invalid, and royalties were therefore not owed. Soon after, on March 5, 2010, PTI filed this declaratory action.

PTI's complaint in this action asserted two separate claims for relief. First, PTI sought a declaration that the "wBGA products [did] not infringe the '106 [p]atent." Complaint for Declaratory Judgment at 4, *Powertech Tech. Inc. v. Tessera, Inc.*, No. 3:10-CV-00945 (N.D. Cal. Mar. 5, 2010), ECF No. 1. However, a similar declaration of non-infringement was not sought for PTI's µBGA products. Second, PTI sought a declaration that the '106 patent was invalid. *Id.* at 5. This claim for relief was not based on the same invalidity defense asserted by the defendants in the ITC action, in which the Worp, Juskey, and Chia references were used as anticipatory prior art. Instead, PTI alleged that the '106 patent was invalid based on other prior art raised in a pending reexamination of the '106 patent before the United States Patent and Trademark Office ("PTO"). There, the PTO examiner rejected original claims 1–4, 9, 10, 33 and 34 and newly submitted claims 48 and 50–52 as anticipated by European Patent Application No. 0,399,300 ("Tanaka"), a prior art reference that was not at issue in the ITC and Texas actions. The examiner also rejected original claim 35 and newly submitted claims 53–55 as obvious in light of Tanaka in view of various other pieces of prior art and rejected claims 56–59 as anticipated under § 102(e) by U.S. Patent No. 5,450,283 to Lin.[3]   Tessera's appeal before the Board of Patent Appeals and Interferences ("Board") is still pending as of the date of this decision.

---

[3]   Thus, original claims 1–4, 9, 10, and 33–35 and newly submitted claims 48 and 50–59 were rejected. Original claims 5–8, 11–32, and 36–47 were not subject to reexamination, and new claims 49 and 60–62 were held patentable.

In response to PTI's complaint in the current declara-
tory action, Tessera filed a motion to dismiss for lack of
subject matter jurisdiction. According to Tessera, the ITC
and Texas actions against PTI's customers could not
create a controversy because, so long as PTI remained a
licensee in good standing, PTI's customers would also
enjoy protection against any infringement suit. Tessera
contended that there was no controversy as to the royalty
payments "so long as PTI [paid] the agreed upon royalties
on the products defined as royalty bearing under the
Agreement." J.A. 62. Tessera also argued that there was
no controversy because, even if the '106 patent were found
invalid or non-infringed, such an adjudication would not
relieve PTI of its royalty obligations under the license
agreement. This was so because PTI's royalty obligations
did not turn on the validity or coverage of the '106 patent,
but on an objective definition of the term "TCC Licensed
Product" that would also cover the accused wBGA and
µBGA chips.

On June 1, 2010, the district court granted Tessera's
motion to dismiss for lack of subject matter jurisdiction.
The district court held that PTI's products could not have
been at issue in the ITC action because "PTI's products
[were all] manufactured pursuant to a license with
Tessera, which has explicitly excluded licensed products
from its enforcement actions." J.A. 6. Additionally, the
court concluded there was no actual controversy arising
from the license agreement because the license agreement
itself required PTI to pay royalties whether or not its
products were covered by the '106 patent. Thus, any
declaration of non-infringement or invalidity sought by
PTI would not "redress any imminent injury [or] materi-
ally alter the status quo." J.A. 9. Finally, the court sua
sponte held that, even if there were an actual controversy,
the court would have declined to hear the case because

POWERTECH v. TESSERA

judicial efficiency favored hearing the declaratory action
along with the pending Texas action.   PTI timely ap-
pealed when its motion for reconsideration was denied,
and we have jurisdiction pursuant to 28 U.S.C.
§ 1295(a)(1).

DISCUSSION

I

We review the district court's dismissal for lack of
subject matter jurisdiction de novo.  *Air Measure Techs.
Inc. v. Akin Gump Strauss Hauer & Feld, LLP*, 504 F.3d
1262, 1267 (Fed. Cir. 2007).  The burden is on the party
claiming declaratory judgment jurisdiction to establish
that such jurisdiction existed at the time the claim for
declaratory relief was filed.  *King Pharm., Inc. v. Eon
Labs, Inc.*, 616 F.3d 1267, 1282 (Fed. Cir. 2010); *Benitec
Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed.
Cir. 2007).

In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118,
132 n.11 (2007), the Supreme Court rejected our prior,
more stringent standard for declaratory judgment stand-
ing insofar as it required a "reasonable apprehension of
imminent suit."  *See also, SanDisk Corp. v. STMicroelec-
tronics, Inc.*, 480 F.3d 1372, 1378–79 (Fed. Cir. 2007).
Under the Court's new standard, an Article III case or
controversy exists when "the facts alleged, under all the
circumstances, show that there is a substantial contro-
versy, between parties having adverse legal interests, of
sufficient immediacy and reality to warrant the issuance
of a declaratory judgment." *MedImmune*, 549 U.S. at 127
(internal quotation marks and citation omitted).    The
dispute must be "definite and concrete, touching the legal
relations of parties having adverse legal interests," such
that the dispute is "real and substantial" and "admi[ts] of
specific relief through a decree of a conclusive character,

as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (internal quotation marks and citation omitted).

In *Arris Group Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1374 (Fed. Cir. 2011), we recognized the requirement in *MedImmune* that there be an "adverse legal interest" for there to be declaratory judgment jurisdiction. This "adverse legal interest" required a "dispute as to a legal right—for example, an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring." *Id.* "In the absence of such a legal controversy . . . , a mere adverse economic interest is insufficient to create declaratory judgment jurisdiction." *Id.* at 1374–75. We went on to conclude that a legal controversy did exist in *Arris* because the licensee—supplier of the product-at-issue—could incur potential legal liability for contributory infringement based on the patentee's infringement contentions against the licensee's customer:

> Where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if . . . there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.

*Id.* at 1375.

## A

On appeal, PTI alleges that two controversies exist in creating declaratory judgment jurisdiction. First, it alleges that Tessera's allegations against its customers in

the ITC and Texas actions create a controversy as to whether its wBGA and µBGA chips infringe the '106 patent, either because the chips are not within the scope of the claims (the wBGA chips) or because the '106 patent is invalid (the wBGA and µBGA chips). PTI argues that Tessera's pending claims of infringement in the ITC and Texas proceedings create a sufficient controversy because they directly implicate PTI's products and customers. Tessera maintains there is no controversy because all of PTI's products were "properly licensed" and categorically excluded from the enforcement of the '106 patent in the ITC and Texas actions. In particular, Tessera pointed to the following disclaimer in its ITC complaint, which stated that: "To the extent that any Accused Product is found to be *properly licensed* . . . under Tessera's patents, Tessera does not intend to bring—nor should Tessera be construed to have brought—any such Accused Product(s) within the scope of the present Investigation." Complaint Under Section 337 of the Tariff Act of 1930, as Amended, ¶9, *In re Certain Semiconductor Chips With Minimized Package Size and Products Containing Same (III)*, Inv. No. 337-TA-630 (Dec. 7, 2007) (emphasis added).

Tessera's position in the current action, however, is inconsistent with its arguments in the ITC action. There, Tessera maintained that products were only licensed and not-infringed if royalty payments were current. Because some licensees, including PTI, had allegedly underpaid their royalties or had paid them late, Tessera asserted that those sales were "unlicensed" and did not trigger exhaustion of its patent rights. These allegations created a controversy as to whether certain sales of PTI's products were unlicensed and infringing.

While we conclude that Tessera's allegations against PTI's customers with respect to infringement in the ITC and Texas actions created declaratory judgment jurisdic-

tion,[4] it is clear that resolution of that controversy is governed by our decision in *Tessera*. There, we ruled that "Tessera's patent rights [were] exhausted as to all products accused of infringing the '106 patent purchased from Tessera's licensees."   *Tessera*, 646 F.3d at 1370–71. Relying on the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc*, 553 U.S. 617, 635 (2008), we held that patent exhaustion was, in fact, triggered "by an [initial] sale authorized by the patent holder." *Id.* at 1369.   Because each of Tessera's TCC license agreements contained an unconditional grant of a license "to sell . . . and/or offer for sale" the accused products, we held that Tessera's licensees were authorized to sell the accused products when the TCC Licenses were initially granted. *Id.* at 1370.   We therefore rejected Tessera's theory that previously-licensed products would become unlicensed when a licensee's royalty payments lapsed:

> That some licensees subsequently renege or fall behind on their royalty payments does not convert a once authorized sale into a non-authorized sale. . . . That absurd result would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of the licensee, and

---

[4]   The district court appeared to suggest that Tessera never accused PTI's customers and products in the ITC and Texas actions.   However, we have no doubt that PTI's customers and products were specifically targeted in those actions.   For example, witnesses for Elpida testified that the accused products in the ITC and Texas actions were licensed from several licensees, including PTI.   Indeed, Tessera's infringement expert in the ITC action focused part of his analysis on an Elpida wBGA chip that was clearly packaged by PTI and identified with a PTI model number.

would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit post-sale restrictions on the use of a patented article.

*Id.* at 1370. Although the resolution of the ITC action will not have preclusive effect on either the district court in Texas or the district court in this case,[5] both courts are nonetheless bound by stare decisis to abide by any legal precedents established by our court in *Tessera*. *See Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568–70 (Fed. Cir. 1996) (the denial of preclusive effect to ITC determinations does not allow district courts or subsequent panels of this court to "ignore holdings of this court that bear on cases before them"). In *Tessera*, we held that sales authorized under a license do not become unauthorized or infringing sales because a licensee subsequently delays royalty payments due under that license. 646 F.3d at 1370.

Because neither party disputes that PTI's wBGA and µBGA products are covered by the license agreement, to the extent Tessera's claims against PTI's customers arise from the same set of facts addressed in *Tessera*, the result we reached there would control equally here. Accordingly, we vacate the dismissal on jurisdictional grounds and remand with instructions to apply our decision in *Tessera*.

---

[5]    *See, e.g., Tex. Instruments Inc. v. Int'l Trade Comm'n*, 851 F.2d 342, 344 (Fed. Cir. 1988) (stating that ITC determinations regarding patent issues should be given no collateral estoppel effect); *Tandon Corp. v. Int'l Trade Comm'n*, 831 F.2d 1017, 1019 (Fed. Cir. 1987) ("[O]ur appellate treatment of decisions of the Commission does not estop fresh consideration by other tribunals."); *Corning Glass Works v. Int'l Trade Comm'n*, 799 F.2d 1559, 1570 n.12 (Fed. Cir. 1986) (stating that the legislative history of the Trade Reform Act of 1974 supports the position that ITC decisions have no preclusive effect in district courts).

## B

Second, PTI contends that a controversy exists as to PTI's continued obligation to pay royalties for the sales of its wBGA and µBGA chips under the license agreement with Tessera. In particular, PTI argues that the terms of the license agreement do not require it to pay royalties for the wBGA chips if those chips do not infringe or for the wBGA and µBGA chips if the patent is invalid. Tessera argues that royalty payments are due even if the products do not infringe the '106 patent and regardless of the patent's validity. Despite the existence of this dispute, Tessera appears to maintain that there can be no Article III controversy as long as PTI complies with all the terms of the license agreement, including the payment of royalties. In essence, Tessera's argument is that PTI must breach its license before it can challenge the validity of the underlying patent. This contention, however, is contrary to the Supreme Court's decision in *MedImmune*, in which the Court held that a licensee did not need to repudiate a license agreement by refusing to pay royalties in order to have standing to declare a patent invalid, unenforceable, or not infringed. 549 U.S. at 137; *see also Altvater v. Freeman*, 319 U.S. 359, 362 (1943). Like the petitioner in *MedImmune*, PTI is seeking to define its rights and obligations under its contract with Tessera. It need not repudiate its license agreement to do so. There is also no provision in the license agreement in which PTI has agreed not to argue non-infringement or invalidity. *See MedImmune*, 549 U.S. at 135.

Although the license agreement covers multiple patents, the key question appears to concern the '106 patent. In both the ITC and Texas actions, Tessera alleged that the wBGA products were covered by the unexpired '106 patent and two other patents that have now expired, U.S.

Patent Nos. 5,679,977 and 6,133,627.[6]  Tessera made no claim that it could continue to collect royalty payments with respect to those expired patents.  Tessera's claim to royalties on PTI's products thus appears to be tied directly to the '106 patent.

The parties devote considerable attention to the question of whether the terms of the license agreement require royalty payments to be tied to patent coverage or patent validity.  They dispute whether the district court was correct as to the interpretation of that contract language. PTI also maintains that a condition of patent coverage and validity should be implied by legal necessity under California law.  *See* Cal. Civ. Code § 1655–56 (stating that, under California contract law, any conditions that make a contract reasonable, conform it to industry usage, or are necessary to carry it into effect, are deemed implied unless the contract manifests a contrary intention); *Stockton Dry Goods Co. v. Girsh*, 227 P.2d 1, 3–4 (Cal. 1951) (holding that an implied term exists when legal necessity justifies the implication).  Relying on the Supreme Court's decision in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969), PTI argues that legal necessity compels an interpretation that royalty payments be tied to patent coverage or patent validity.  PTI points out that conditioning the grant of a license on the payment of royalties on products which use the teaching of expired patents is patent misuse.  *See Brulotte v. Thys Co.*, 379 U.S. 29, 30 (1964); *Beckman Instruments, Inc. v. Technical Dev. Corp.*, 433 F.2d 55, 61 (7th Cir. 1970). Just as it would be patent misuse to require the payments of royalties on an expired patent, *Brulotte*, 379 U.S. at 30, PTI argues that it would be patent misuse to require

---

[6]   Tessera also alleged infringement of U.S. Patent No. 6,458,681, but withdrew these allegations in the ITC action.

payment of royalties for products that did not infringe or where the patents were invalid. Because a contract must be interpreted in a way that would make it lawful, *see* Cal. Civ. Code § 1643, PTI urges that there be an implied requirement for royalty-bearing products to fall within the scope of a valid patent.

On the other hand, Tessera argues that the Supreme Court in *Zenith Radio* rejected PTI's theory and held that a total sales royalty (i.e., a royalty based on a licensee's total sales of a product) "is not patent misuse, 'even if, as things work out, only some or none of the merchandise employs the patented idea or process, or even if it was foreseeable that some undetermined portion would not contain the invention.'" Appellee's Br. at 48 (quoting *Zenith Radio*, 395 U.S. at 138).

We need not decide whether PTI or Tessera is correct as to this issue. The merits of this dispute are not before us. No motion to dismiss for failure to state a claim or motion for summary judgment has been filed, and no discovery into the proper interpretation of the license agreement has been conducted.[7] The Supreme Court in

---

[7] In light of the fact that no discovery has been conducted, the district court's contract interpretation was clearly premature. Under California law, courts can consider evidence apart from the contract to explain the meaning of terms that are otherwise unambiguous. *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001) (applying California law); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."). Thus, although the license agreement may appear unambiguous

*MedImmune* made clear that, in almost identical circumstances, the issue of contract interpretation is a merits issue, not appropriate to decision on a motion to dismiss under Rule 12(b)(1). 549 U.S. at 135–36 ("[E]ven if respondents were correct that the licensing agreement . . . precludes this suit, the consequence would be that respondents win this case on the merits—not that the very genuine contract dispute disappears, so that Article III jurisdiction is somehow defeated."). Here, we simply hold that the dispute between PTI and Tessera—as to whether the license agreement requires royalty payments to be tied to valid patent coverage—is sufficient to support declaratory judgment jurisdiction. We leave the merits-based arguments to the district court to consider on remand.

## II

Finally, we address the propriety of the district court's alternative ground for dismissal. The district court sua sponte held that, even if PTI had established an actual controversy, the court would nonetheless dismiss the case because "the interests of judicial efficiency would favor hearing PTI's declaratory judgment action along with [the pending Texas action]." *Powertech*, slip op. at 9. On appeal, PTI argues that the district court abused its discretion by ignoring the forum selection clause in the license agreement. This clause stated that "if either party files a claim in a state or federal court, such claim shall be filed in the state or federal courts in California." J.A. 110. In *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972), the Supreme Court held that a forum-selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unrea-

on its face, further discovery could shed light on the proper interpretation of its terms.

sonable' under the circumstances." [8]   Moreover, Ninth
Circuit law requires that, in considering the dismissal of a
case, forum selection clauses should be enforced unless
there is a strong public policy against doing so.  *Jones v.
GNC Franchising, Inc.*, 211 F.3d 495, 497–98 (9th Cir.
2000) (citing *M/S Bremen*, 407 U.S. at 1); *Docksider, Ltd.
v. Sea Tech., Ltd.*, 875 F.2d 762, 763-64 (9th Cir. 1989).
In *Docksider*, the Ninth Circuit held that "[w]here venue
is specified with mandatory language, the clause will be
enforced." 875 F.2d at 764.  The forum selection clause
there used mandatory "shall" language to designate
Virginia as the proper forum, stating that "[v]enue . . .
*shall* be deemed to be in . . . Virginia." *Id.* at 763 (empha-
sis added).  Here, the forum selection clause in PTI's
license agreement employs similar "shall" language to
mandate jurisdiction in California.  It is clear that the
district court erred in failing to enforce the forum selec-
tion clause.

Other special circumstances also suggest that the fo-
rum selection clause should be enforced. Here, the choice-
of-law provision in the license agreement manifests the
parties' intent that the license agreement be "governed,
interpreted and construed in accordance with the laws of
the State of California." J.A. 110.  Furthermore, the
district court in California is already entertaining multi-
ple declaratory actions related to the '106 patent, includ-
ing *Siliconware Precision Industries Co. v. Tessera, Inc.*,
No. 4:08-cv-03667 (N.D. Cal.); *ChipMOS Technologies,*

---

    [8]   Under the Supreme Court's decision in *Stewart
Org. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988), holding that a
forum selection clause was not always dispositive, differ-
ent considerations governed a motion to transfer under §
1404(a) in diversity jurisdiction cases.  Such a motion is
not involved here, but, as we discuss below, judicial
efficacy under the standards of §1404(a) also favor Cali-
fornia as the proper forum.

*Inc. v. Tessera, Inc.*, No. 4:08-cv-03827 (N.D. Cal.); and *Advanced Semiconductor Engineering Inc. v. Tessera Inc.*, No. 4:08-CV-03726 (N.D. Cal.).[9] Nothing suggests that a Texas court would confer any additional conveniences with respect to the availability of evidence or potential witnesses, nor has Tessera provided adequate cause to override PTI's choice of forum. We therefore hold that it was an abuse of discretion for the district court to refuse jurisdiction over this action.

### III

For the foregoing reasons, the district court's dismissal of the declaratory judgment action is reversed. We remand for proceedings consistent with this opinion.

### REVERSED and REMANDED

---

[9]   These cases have been consolidated and are currently stayed pending resolution of the ITC action.