UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| POWERTECH TECHNOLOGY INC. | Case Nos. 4:10-cv-00945-CW<br>4:11-cv-06121-CW |
| Plaintiff and Counterclaim Defendant, | |
| v. | **ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT** |
| TESSERA, INC., | |
| Defendant and Counterclaim Plaintiffs, | **(Re: Docket Nos. 500-4 and 501-3)** |
| v. | |
| MACROTECH TECHNOLOGY., INC., | |
| Counterclaim Defendant. | |

On the eve of Valentine's Day, on February 13-14, 2014, the parties in this breach of contract case met with the undersigned in a lengthy and ultimately successful settlement conference. Unfortunately, mere days later, the parties confronted significant differences in their views of the tax withholding responsibilities created as a result of the agreement. This dispute is no mere technicality; the effect of a resolution one way or another could be worth as much as $49 million. Despite multiple letter briefs and further conferences, these issues have not yet been

1
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM
SETTLEMENT AGREEMENT

resolved. And so the undersigned was left with no choice but to resolve the dispute by shifting roles from facilitator to decision-maker. After submitting further briefing, the parties appeared for a hearing on the matter.

A district court has ancillary jurisdiction to resolve settlement agreement disputes when it explicitly retains jurisdiction,[1] as the parties here provided in the term sheet.[2] Having considered the parties' arguments, the court finds that PTI acted largely in accordance with the parties' agreement when it withheld Taiwanese tax from the settlement payments. With respect to the $31.4 million settling claims for unpaid royalties, however, PTI shall "gross-up" this payment, if necessary, to ensure Tessera receives a net payment of $31.4 million. With respect to the portion of payments settling all other claims, PTI may continue to withhold the appropriate taxes, as required by Taiwanese law.

## I. BACKGROUND

PTI is a Taiwan-based manufacturer of semiconductors. PTI filed the underlying case against Tessera in December 2011, alleging claims breach of contract and fraud arising out of a license agreement signed by the parties in 2003.[3] Despite the hammer-and-tong litigation that followed, the parties nevertheless engaged in parallel and ongoing settlement negotiations beginning in December 2012. At one point during those discussions, in May 2013, Tessera produced a draft settlement agreement.[4] But any real progress was hard to come by. In late 2013,

---

[1] *See Ortolf v. Silver Bar Mines, Inc.*, 111 F.3d 85, 87 (9th Cir. 1997) (citing *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 381 (1994)) (noting ancillary jurisdiction "[h]ad the district court retained jurisdiction to enforce the settlement of the earlier lawsuits").

[2] *See* Docket No. 501-4 at 4 (The term sheet provides: "To the extent disagreements arise during [the process of reducing the term sheet to a final writing], those disagreements will be resolved by Judge Paul Grewal; this resolution shall be final and non-appealable. The U.S. District Court for the Northern District of California will retain jurisdiction to enforce the parties' settlement agreement.").

[3] *See* Docket No. 253-1 at 9.

[4] *See* Docket No. 500-4 at 1.

2
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

however, Chief Judge Wilken's rulings on several summary judgment motions significantly changed the landscape.[5] This case was then referred to this court for the purpose of facilitating a final settlement agreement.[6]

On January 27, 2014, the parties joined the undersigned here in San Jose for a settlement conference. No settlement was reached. On February 13, 2014, after a series of follow-up calls, the parties again joined the undersigned for a settlement conference. In addition to their attorneys, the parties' representatives at both conferences included Tessera Chief Executive Officer Tom Lacey and PTI Chairman and Chief Executive Officer D.K. Tsai. After about 14 hours of negotiations, at around 12:30 a.m. on February 14, 2014, the parties reached a deal resolving Tessera's claims that was memorialized in a signed term sheet.[7] There was no equivocation as to the finality of the agreement; the parties explicitly agreed that this was a binding, enforceable agreement.[8] The term sheet provided that PTI would pay Tessera a "total of $196 million in payments," to be made over the next five years.[9] The term sheet also terminated the License Agreement between the parties, as of December 2012, that would have otherwise extended until 2027.[10] The term sheet did not, however, explicitly provide for the tax treatment of the payments; specifically, which party would be responsible for paying any tax obligations owed as a result of the agreement to the Taiwanese tax authority.

---

[5] *See* Docket No. 501-3 at 10.

[6] *See* Docket at 1/15/2014.

[7] *See* Docket No. 501-4.

[8] See Docket No. 501-5, Ex. B.

[9] *See* Docket No. 501-4 at 1.

[10] *See* Docket No. 501-4 at 3; Docket No. 500-6, Ex.10 at 6.

3
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

Consistent with the term sheet, and as the parties worked to transform the term sheet into a more fulsome document, PTI made its first payment on February 27, 2014.[11] As required by Taiwanese law, PTI withheld 20 percent of that payment.[12] PTI provided to Tessera a receipt of both the wire transfer and income tax withheld.[13] This dispute arose because Tessera complained that it should receive the total payment agreed to in the term sheet, net of taxes, and any withholding requirement should be borne by PTI.[14] Tessera thus views the payment as a breach of the settlement agreement.[15] PTI maintains the payment was not to be made net of taxes and it therefore must withhold the required taxes from the agreed-upon amount. The issue before this court is whether PTI should withhold the mandatory 20 percent from the total amount specified in the agreement, or whether it should withhold from a "grossed-up" amount so that Tessera receives the full amount net of taxes.

## II. DISCUSSION

### A. Settlement Payments May Be Taxed in both Taiwan and in the United States

The Taiwan Income Tax Act requires a local company making payments to a foreign company, without a permanent establishment or business agent in Taiwan, to withhold from such

---

[11] *See* Docket No. 500-4 at 5.

[12] *See id.*

[13] *See id.*

[14] *See* Docket No. 501-3 at 3.

[15] *See* Docket No. 500-31, Ex.A.

4

Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

payments the income tax imposed upon such payments and payable by the foreign company.[16] The applicable income tax rate is 20 percent.[17]

Under a 2004 program, the Taiwanese National Taxation Bureau may grant an exemption from this requirement, determined on a case-by-case basis, for the purpose of encouraging the importation of new technologies into Taiwan.[18] This exemption is available for royalty payments for foreign technology, but does not apply to settlement payments unrelated to the acquisition of technology.[19] PTI thus is required by Taiwanese law to withhold 20 percent from each payment to Tessera unless an exemption is granted by the Taiwanese tax authorities.[20]

There is no double taxation treaty between the United States and Taiwan.[21] The U.S. does, however, provide some relief to businesses paying tax on foreign source income both in a foreign jurisdiction and in the U.S. In order to avoid double taxation, the U.S. provides a Foreign Tax Credit ("FTC"), allowing businesses to receive a credit towards their U.S. tax liability for any income taxes paid to a foreign jurisdiction on income derived from a non-U.S. source.[22] The business has ten years to claim the full value of this credit.[23]

---

[16] *See* Docket No. 500-6, Ex. 2 at 2. The chairperson of the board of directors in the local company also may be personally liable for any shortfall in tax withheld. *See id.*

[17] *See* Docket No. 500-6, Ex. 3 at 5. Tessera bears the burden of this 20 percent tax withholding under a 2013 settlement agreement with another Taiwanese company. *See* Docket No. 500-6, Ex. 4 at ¶ 2.2(c).

[18] *See* Docket No. 500-6, Ex. 3 at 3. Although only the foreign company can apply for the income tax exemption, the local company may act as a filing agent. *See* Docket No. 500-6, Ex. 2 at 4.

[19] *See* Docket No. 500-6, Ex. 3.

[20] *See* Docket No. 500-29, Ex.A; Docket No. 500-6, Ex.2 at 3. If the foreign company believes tax was wrongly withheld, it has the right to apply for a refund of the excess tax. *See id*. at 2. This may occur, for example, if an exemption is approved with respect to payments already made and tax was withheld from those payments.

[21] *See* Docket No. 500-6, Ex. 3 at 5.

[22] *See* 26 U.S.C. § 901(b)(1).

[23] *See* 26 U.S.C. § 904(c).

Under this scheme, Tessera may claim a FTC for any amount PTI withholds and pays to the Taiwanese government, which can then be used to offset U.S. taxes otherwise owed on foreign source taxable income.[24] If Tessera does not have sufficient foreign source taxable income in a particular income year, it cannot use the FTC and will have to carry it over to the next year.[25] Tessera argues FTCs involve risks not associated with cash payments because they might expire before they can be used, meaning they may have little to no value for Tessera.[26] However, it is also possible that Tessera will be able to use the FTCs to offset its U.S. taxes, in which case they will have tremendous value. There is simply no certainty at this point.

The parties agreed to $196 million in settlement payments, which is either (1) the total amount received by Tessera or (2) the total amount paid out by PTI. Because of the mandatory 20 percent withholding requirement in Taiwan, it cannot be both. The parties agree on this much. The parties disagree, however, on which scenario they agreed to under the terms of the settlement.

### B.   The Tax Burden of the Settlement Agreement Should Be Born By Both Parties

The construction and enforcement of settlement agreements are governed by principles of local law that apply to the interpretation of contracts, even if the underlying cause of action is federal.[27] In California, a contract must be "interpreted as to give effect to the mutual intention of

---

[24] *See* Docket No. 501-3 at 14.

[25] *See id*.

[26] *See id*. at 15.

[27] *See United Commercial Ins. Serv., Inc. v. Paymaster Corp.,* 962 F.2d 853, 856 (9th Cir. 1992); *Gorman v. Holte*, 164 Cal. App. 3d 984, 988 (Cal. Ct. App. 1985) ("Compromise settlements are governed by the legal principles applicable to contracts generally" (citing *T. M. Cobb Co. v. Superior Court*, 36 Cal. 3d 273, 280 (1984); 12 Cal. Jur. 3d, Compromise, Settlement and Release, § 55 p. 353)); *see also City of Bell v. Superior Court*, 220 Cal. App. 4th 236, 247 (2013) (holding that all written agreements are to be construed based on "generally accepted canons of interpretation").

6
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

the parties as it existed at the time of contracting," looking to the whole contract taken together and the circumstances under which it was made.[28]

PTI initially requests the court to simply incorporate into the final agreement the language of Section 3.2(c) from the proposal drafted by Tessera in May 2013 ("May 2013 Draft").[29] Under that section, Tessera would bear all tax responsibilities and PTI would withhold as required.[30] However, "for the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal" and "the reference must be called to the attention of the other party and he must consent thereto."[31] Here, the term sheet did not clearly and unequivocally incorporate the May 2013 Draft or any of its terms. That much is clear. The language of Section 3.2(c) therefore may not simply be incorporated. To resolve this dispute, the court must turn elsewhere.

Tessera argues the amount it was to receive under the agreement would be net of any withholding tax by focusing on the language of the term sheet.[32] For example, the term sheet provides "PTI and MTI will pay $50 million ('the up front payment') to Tessera" and it later provides "conditioned upon receipt by Tessera of the initial $50 million payment."[33] Tessera urges

---

[28] *See* Cal. Civ. Code § 1636; Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); Cal. Civ. Code § 1647 ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"); *Broome v. Broome* 104 Cal. App. 2d 148, 157 (1951) ("The purpose of a writing must be ascertained solely from a common sense meaning of it as a whole with a view to effectuating the mutual intention of parties" (citation omitted)).

[29] *See* Docket No. 500-4 at 6.

[30] *See* Docket No. 500-4 at 1; Docket No. 500-6, Ex.1 at 4.

[31] *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 814 (1998) (emphasis and quotations omitted); *see also In re Marriage of Iberti*, 55 Cal. App. 4th 1434, 1440 (1997) (refusing to add qualifying language to the agreement where it would substantially alter the agreement).

[32] *See* Docket No. 501-3 at 2.

[33] See Docket No. 501-4 at 1-2.

7
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

that because this language is framed as amounts Tessera would receive, it shows the parties intended the settlement payments to be net cash payments.[34]  PTI, however, also argues the language of the term sheet substantiates its interpretation.  For example, the term sheet acknowledges there will be a "total of $196 million in payments," not a total of $196 million plus amounts necessary to pay applicable withholding taxes.[35]  PTI also points to the provision in Tessera's proposed final agreement that acknowledges PTI's legal obligation is subject to the Taiwanese government tax laws.[36]  Because the language of the term sheet is unclear and susceptible to more than one reasonable interpretation, the court must look to the circumstances surrounding the preparation of the term sheet.[37]

The May 2013 proposal would appear to be evidence of the intent of the parties because it was the starting point of the settlement conference and Tessera even used that draft to compile the proposed final agreement.[38]  Furthermore, before the settlement conference, the undersigned suggested the parties use the May 2013 Draft to compile a list of issues to discuss.  However, Tessera explicitly withdrew its proposal before attending the conference in February.  It would be unreasonable to bind either party to any of those terms of May 2013 proposal to which it did not specifically agree.  Furthermore, the draft was produced before the parties received rulings on several summary judgment motions, which substantially changed the parties' assessments of the

---

[34] *See* Docket No. 501-3 at 3.

[35] *See* Docket No. 500-4 at 9.

[36] *See* Docket No. 500-4 at 13. That provision provides "[n]otwithstanding the other provisions of this Agreement, the obligations of the Parties are subject to all laws, rules, regulations, government bodies having jurisdiction over such Persons and to orders, regulations or requests."

[37] *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1240-41 (1999) ("[W]e can explain a contract by reference to the circumstances under which it was made, as well as the matter to which it relates." (citing Cal. Civ. Code § 1647)).

[38] *See* Docket No. 500-5.

case's value.[39]  The court is not persuaded the parties intended the undiscussed terms of the May 2013 Draft to be binding on this new round of settlement negotiations.

The most significant surrounding circumstance and best evidence of the parties' intentions is the 2003 License Agreement.  That agreement was the factual predicate for Tessera's unpaid royalty claims in this litigation and nothing in the settlement agreement changed the prior method of tax allocation.[40]  Under the 2003 License Agreement, Tessera was to receive royalty payments net of any Taiwanese taxes withheld.[41]  Although Tessera did not pay income tax on these royalty fees, neither did PTI.  This was because Tessera had received an exemption from the Taiwanese National Taxation Bureau, which relieved PTI of its corresponding withholding requirements.[42]  Absent this exemption, however, PTI would have needed to gross-up payments and withhold taxes in order to pay Tessera the net payment amount.  Because the parties previously agreed on this tax allocation structure with respect to royalty payments, and in the absence of bad faith,[43] the court concludes it should continue to control.  Because the agreement settled more than just claims for unpaid royalties, however, applying this framework to the whole agreement is not appropriate.[44]

---

[39] *See* Docket No. 501-3 at 10.

[40] *See* Docket No. 501-3 at 4; *Feerer v. Amoco Prod. Co.*, 242 F.3d 1259, 1264 (10th Cir. 2001) (holding that where nothing in the settlement agreement authorized a change to the existing method of allocating tax payments among the parties, and absent expressly changing the method in the settlement agreement, the prior method of tax allocation controls); *see also So. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1241 (1999) (noting that extrinsic evidence on course of dealing can be offered "where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity"); Cal. Com. Code § 1303(d) ("A course of performance or course of dealing between the parties … is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.").

[41] *See* 2003 License Agreement at 5.

[42] *See* Docket No. 5006, Ex. 3 at 3.

[43] *Cf. Slotta v. Texas A & M Univ. Sys.*, Case No. CIV.A. G-93-92, 1994 WL 16170227, at *2 (S.D. Tex. Aug. 10, 1994) (requiring gross-up based on dilatory and bad faith tactics).

[44] *See* Docket No. 500-4 at 10.

The portion of the payments attributable to unpaid royalties should be treated separately from the rest of the payments.

With respect to the portion of the payments settling claims for unpaid royalties, PTI should bear the responsibility for paying any taxes owed to the Taiwanese government arising out of these payments. The tax exemption previously granted was of limited scope and does not necessarily extend to payments made under the settlement agreement, even if paid to compensate for unpaid royalties.[45] The parties will thus need to apply again for the exemption.[46] Apparently, PTI has already initiated this process, but requires an invoice from Tessera to show the portion of the settlement payments attributable to back royalties.[47] Tessera shall cooperate and make all reasonable efforts to assist PTI in this process. But PTI is ultimately responsible for grossing up payments compensating for unpaid royalties, if necessary, so that Tessera receives the net amount.

With respect to the portion of the payments settling all other claims, the language of the agreement is not clear, and there is no course of dealing between the parties from which to glean their intentions, so the general principals of law underlying settlement payments apply. Looking to the more common, purely domestic, settlement context, it is well-established that settlement payments do not escape the purview of mandatory tax laws. For example, settlement payments in the United States constitute gross income and are subject to income tax unless expressly excluded

---

[45] *See* Docket No. 500-6 at 4.

[46] PTI is relieved of its obligation to pay those taxes if the parties are successful in receiving an exemption.

[47] *See* Docket No. 500-4 at 4. The invoice for $31.4 million must be for payment for past royalties for "assembly" under the TCC License. *See id*.; Docket No. 500-6, Ex.3 at 4. It is unclear from the papers what amount may be eligible for the exemption. PTI suggests the amount is either $24.8 million or $31.4 million. *See* Docket No. 500-6, Ex. 3 n.42; Docket No. 500-29 at 1. If there is a $31.4 million exemption, this would reduce the amount subject to withholding tax down from $196 million to $164.6 million. *See* Docket No. 500-6, Ex.3 at 4. The total withholding tax would then come down from $39.2 million to $32.92 million (a difference of $6.28 million).

10
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

by another provision in the Tax Code.[48]  It also is well-established that employers are to withhold tax from those portions of the agreed upon settlement amounts paid to compensate for lost wages.[49]  The case law thus establishes that when there is a withholding requirement imposed on one party by a government authority, that party must comply with the requirement as it applies to settlement payments.  Where the parties do not establish otherwise, the presumption is that taxes are levied on the total settlement amount agreed upon.[50]  Even if royalties to a company are not the same as wages to an employee, the court finds no reason why the same principals should not apply.  Withholding taxes from the settlement amount is proper, whether required by the United States government or a foreign government, especially under an agreement between equally and quite sophisticated parties.

Tessera finally argues the FTCs do not have comparable value to it as cash, and so any structure allocating tax responsibilities other than one that results in Tessera receiving the full

---

[48] *See C.I.R. v. Schleier*, 515 U.S. 323, 327-29 (1995) The Internal Revenue Code defines gross income broadly as "all income from whatever source derived," except as excluded by other provisions of the Code.  *See* 26 U.S.C. § 61(a); *Rivera v. Baker W., Inc.*, 430 F.3d 1253, 1256 (9th Cir. 2005)).

[49] *See Rivera v. Baker W., Inc.*, 430 F.3d 1253, 1259 (9th Cir. 2005) ("certain settlement payments fit easily within FICA's broad definition of 'wages' as 'all remuneration for employment unless specifically excepted.") (citations and quotations omitted); *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766 (9th Cir. 1986) (holding that the duty to withhold is mandatory, rather than discriminatory, in nature); *In re Beeson*, Case No. 01-42214, 2003 WL 23777739, at *2 (Bankr. D. Kan. May 15, 2003) ("Any amount of the settlement that is attributable to back wages is subject to the withholding of FICA taxes by the employer." (citing *See North Dakota State University v. U.S.,* 225 F.3d 599, 603 (8th Cir. 2001))); *Carroll v. Dep't of Police*, Case No. 2006-ca-0726, 946 So. 2d 674, 677 (2006) ("[W]e find that the deductions [taken for appropriate state and federal employment withholding taxes], albeit not expressly stated as part of the settlement agreement, are a necessary consequence of the agreement and that the deductions thus are proper."); *McGlynn v. Duke Univ.*, 165 N.C. App. 250, 255 (2004) (holding the settlement sum was properly treated as wages and thus subject to withholding of FICA taxes).

[50] *See Mollinger v. Diversified Printing Corp.*, Case No. 88-cv-8301, 1989 WL 115125 (E.D. Pa. Sept. 29, 1989) (concluding "no reasonable person could construe an agreement to pay a consultancy fee of $55,000 as an agreement to bear the federal, state, or local income taxes on that compensation without an express agreement to do so"); *Peacock v. Micro Electronics, Inc.*, 83 Ohio App. 3d 142, 143-44 (1992); *cf. AmBase Corp. v. United States*, 112 Fed. Cl. 179, 186 (Fed. Cl. 2013) (enforcing a "gross-up" on the total settlement amount where the parties specifically agreed to a gross-up provision in the settlement agreement).

11
Case No. 4:10-cv-00945-CW, 4:11-cv-06121-CW
ORDER RE: TAIWANESE WITHHOLDING TAX OBLIGATIONS ARISING FROM SETTLEMENT AGREEMENT

settlement amount net of taxes would deprive it of the full value of the agreement. However, it is undisputed that the FTCs do have some value, and possibly even comparable value as cash. Therefore, an allocation structure "grossing up" the settlement payment would result in a windfall for Tessera, and at PTI's expense.[51] Tessera would receive the full amount of the settlement net of taxes, as well as FTCs for the 20 percent withheld.

In sum, the court finds that the $196 million settlement amount should be classified as $31.4 million for unpaid royalties and $164.6 million for all other claims. The parties shall cooperate to apply for an exemption from the Taiwanese government from paying tax on the portion settling claims for unpaid royalties. Because PTI bears the tax burden on this unpaid royalty portion, PTI shall pay Tessera $31.4 million net of taxes, regardless of the success of the exemption. With respect to the remaining $164.6 million settling all other claims, the court finds that PTI need not "gross up" this amount. Instead, PTI shall pay out a total of $164.6 million, with $131.68 million to Tessera and $32.92 million withheld as required by the government of Taiwan.

**IT IS SO ORDERED.**

Dated: June 5, 2014

PAUL S. GREWAL
United States Magistrate Judge

---

[51] *Josifovich v. Secure Computing Corp.*, Case No. 07-cv-5469-FLW, 2009 WL 2390611, at *7 (D.N.J. July 31, 2009) ("This Court finds that for Plaintiff to receive an additional settlement, in excess of that agreed upon by the parties, when the negotiation was with full awareness of the fact that there would be tax consequences, would constitute a windfall to Plaintiff. The Court therefore denies the request for a "gross up" of the settlement amount to cover any tax liabilities.").